# In the United States Court of Federal Claims

No. 21-493

(Filed Under Seal:  November 18, 2021)
(Reissued:  November 29, 2021)

|  |  |  |
|---|---|---|
| **QUANTERION SOLUTIONS, INC.,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Pre-award bid protest; SBA's decision accepting a procurement into the 8(a) program; "new work;" "price increase;" standing |
| Plaintiff, | | |
| v. | | |
| **UNITED STATES**, | | |
| Defendant, | | |
| **and** | | |
| **KAPILI SERVICES, LLC,** | | |
| Defendant-Intervenor. | | |

Bret S. Wacker, Clark Hill PLC, Detroit, Michigan for plaintiff, Quanterion Solutions, Inc.  With him on the briefs were J. Christopher White, Clark Hill PLC, Lansing, Michigan, and Evan A. Rossi, Rossi & Rossi, New York Mills, New York.

Andrew Hunter, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for the United States.  With him on the briefs were Brian M. Boynton, Acting Assistant Attorney General, and Martin F. Hockey, Jr., Acting Director, and L. Misha Preheim, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice.  Of counsel was Judith L. Richardson, Associate General Counsel, Defense Threat Reduction Agency.

Damien C. Specht, Morrison & Foerster LLP, Washington, D.C. for defendant-intervenor, Kāpili Services, LLC.  Of counsel were James A. Tucker and Alissandra D. Young, Morrison & Foerster LLP, Washington, D.C.

# **OPINION AND ORDER**[1]

LETTOW, Senior Judge.

In this pre-award bid protest, Quanterion Solutions, LLC ("Quanterion") challenges the Small Business Administration's ("SBA") determination that a proposed 8(a) contract involved new work, excusing SBA from the obligation to conduct an adverse impact analysis of Quanterion prior to accepting the requirement and proposed new awardee into the 8(a) program. Quanterion has filed a motion for judgment on the administrative record of SBA's decision. *See* Pl.'s Mot., ECF No. 63. Both defendant, United States, and defendant-intervenor, Kāpili Services, LLC ("Kāpili"), have submitted cross-motions. *See* Def.'s Cross-Mot., ECF No. 69, and Def.-Int.'s Cross-Mot., ECF No. 68. The case is fully briefed, *see* Pl.'s Reply and Resp., ECF No. 70; Def.'s Reply, ECF No. 71; Def.-Int.'s Reply, ECF No. 72, and a hearing was held November 3, 2021. For the reasons stated in this opinion, the court DENIES Quanterion's motion and GRANTS the defendants' cross-motions.

## **BACKGROUND**[2]

This bid protest involves the Defense Threat Reduction Agency ("DTRA" or "the agency") and its Information Analysis Center ("DTRIAC"). The agency's mission is to enable the Department of Defense and the United States government "to prepare for and combat weapons of mass destruction and improvised threats and to ensure nuclear deterrence." AR 8-152.[3] The program conducted by DTRIAC "provide[s] timely electronic access to all nuclear weapons test data, legacy and current, to U.S. [g]overnment programs supporting U.S. [n]uclear [d]eterrent missions." *Id.* The agency conducted market research in 2019 in anticipation of a new contract to continue the "[c]ore [o]perations" of an existing contract under the program (then performed by Quanterion), as well as to undertake two new initiatives within the

---

[1] Because of the protective order entered in this case, this opinion was initially filed under seal. The parties were requested to review the decision and provide proposed redactions of any confidential or proprietary information. The resulting redactions are shown by elipses enclosed by brackets, *e.g.*, "[***]."

[2] The recitations that follow constitute findings of fact by the court from the administrative record of the procurement filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC"). *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[3] The administrative record filed with the court in accord with RCFC 52.1(a) is divided into tabs and is consecutively paginated. The record will be cited by tab and page, *e.g.*, "AR ___-___."

anticipated contract.  *Id.*  As a result of this market research, the agency identified Kāpili, a Native-Hawaiian-Owned small business, which the agency intended to submit to SBA for acceptance into the 8(a) business development program.  AR 9-169.[4]

The agency submitted a letter to SBA in June 2020, offering the new contract requirement, as well as Kāpili, into the 8(a) program and asserting that the proposed contract involved new work, obviating the need to assess whether awarding the contract to Kāpili would have an adverse impact on the incumbent, Quanterion.  AR tab 11.  After SBA failed to respond to the agency's offer letter within five business days, the agency treated Kāpili as automatically accepted into the 8(a) program.  AR 14-338; AR 14-345; AR 21-488.  The agency publicly stated that it would award a sole-source, 8(a) contract, prompting Quanterion to contact the agency in July 2020 to inquire whether SBA had conducted an adverse impact analysis.  AR 21-495 to 497.  The agency responded that it was unaware of whether SBA had conducted an adverse impact analysis.  AR 21-496.

Within about a week of this exchange, DTRA contacted SBA to inquire whether an adverse impact analysis was necessary.  AR 21-487 to 488.  SBA responded by telephone, asking for the agency's "offer letter, the [p]rogram [m]anager['s] analysis of . . . new work, and the [agency's] correspondence . . . with the incumbent."  AR 23-502.  SBA clarified a few days later by email that DTRA could apply "the 25% rule" to determine whether the anticipated contract was new, but it expected "to see the 25% increase [in cost] stemming from new contract requirements that would involve meaningfully different capabilities or work."  AR 24-505.  The agency responded that different capabilities or work accounted for at least 35% of the contemplated contract cost increase.  AR 26-517.

In August 2020, SBA formally responded to the agency's request, indicating its acceptance of the new contract requirement and Kāpili into the 8(a) program on the ground that SBA had found no adverse impact to Quanterion (not on the ground that the agency advanced—that the contract requirement involved new work).  AR 31-1076.  In October 2020, the agency sent Kāpili a request for proposal for the anticipated contract.  AR 39-1110.  Kāpili in turn submitted its proposal to the agency in December 2020.  AR 60b-5152.

Quanterion filed a pre-award bid protest before the Government Accountability Office ("GAO") in November 2020 challenging SBA's decision.  AR 45-4836.  GAO dismissed plaintiff's protest as untimely, AR 50-5097, after which Quanterion filed the protest currently before the court in January 2021, *see* Compl., ECF No. 1.

---

[4] "Section 8(a) [of the Small Business Act] authorizes the Small Business Administration . . . to enter into procurement contracts with other federal agencies and to subcontract performance of these contracts to disadvantaged small businesses."  *Infiniti Info. Sols., LLC v. United States*, 92 Fed. Cl. 347, 349 (2010).

3

In connection with the pending protest, Kāpili contacted the agency in March 2021 to inform it that, as of January 1, 2021, Kāpili no longer qualified as small under the size standard applicable to the anticipated contract. AR 60d-5294. It averred, however, that it had met the applicable size standard when SBA accepted it into the 8(a) program in August 2020 and when it submitted its proposal to the agency in December 2020. *Id.* It indicated that any action by the agency that resulted in a new 8(a) acceptance date would likely render Kāpili ineligible for the projected contract. *Id.* Finally, Kāpili proposed changing the size standard to accommodate its new size or awarding the contract to one of its "8(a) sister firms." AR 60d-5295.

In the proceedings before the court, Quanterion filed a motion for judgment on the administrative record, *see* ECF No. 30, after which the government moved to remand the case to the SBA to reconsider its 8(a) acceptance decision. *See* Def.'s Mot. for Voluntary Remand, ECF No. 35. The government averred that SBA's 8(a) acceptance "letter did not address the documentation and analysis provided by DTRA regarding the question of whether the program was 'new' within the meaning of SBA regulations." *Id.* at 3. Instead, according to the government, SBA's letter had stated that it had conducted an analysis and found no adverse impact against Quanterion. *Id.* The government asserted that SBA should have focused on whether the requirement was new, as indicated in the agency's offer letter, and should not have conducted an adverse impact analysis. *Id.* The court ultimately granted the remand. *See* Order of April 20, 2021, ECF No. 40.

On remand, SBA withdrew Kāpili's acceptance into the 8(a) program. AR 57-5141. The agency submitted a new 8(a) offer letter to SBA, supported by detailed documentation explaining the types and cost of work performed under the existing Quanterion contract requirement and the contemplated Kāpili contract requirement. AR tab 60. Included was a detailed memorandum by the project manager that concluded that new work made up at least 35% of the increase in cost of the contemplated Kāpili contract. AR 60g-5406. Based on the agency's documentation, SBA again accepted Kāpili into the 8(a) program, this time on the grounds that the contract involved new work and that no adverse impact analysis of Quanterion was required. AR 58-5143.

**STANDARDS FOR DECISION**

*A. Motion for Judgment on the Administrative Record*

The standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, govern the court's consideration of a protest of the government's decisions regarding the award of a contract. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Under the APA, the court may set aside a government procurement decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), subject to the traditional balancing test applicable to a grant of equitable relief, *see*

*PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004); *Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014).  "The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (brackets omitted) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).

The court may not "substitute its judgment for that of the agency," *Hyperion*, 115 Fed. Cl. at 550 (quoting *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (in turn quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977))), but "must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *id.* (quoting *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009)).  This is so even if the clarity of the agency's decision is "less than ideal," so long as "the agency's path may reasonably be discerned."  *Federal Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  "'[T]he deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation' because of the highly specialized, detailed, and discretionary analyses frequently conducted by the government."  *CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 434 (2016) (quoting *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 650 (2008)) (additional citations omitted).

The court may overturn the government's procurement decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  In conducting the rational-basis analysis, the court looks to "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333), and affords "contracting officers . . . discretion upon a broad range of issues," *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (quoting *Impresa Construzioni*, 238 F.3d at 1332-33).  Accordingly, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Centech*, 554 F.3d at 1037 (quoting *Impresa Construzioni*, 238 F.3d at 1332-33).  Protests alleging a violation of regulation or procedure "must show a clear and prejudicial violation."  *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333).

*B. Standing*

The plaintiff has the burden of establishing standing to bring a bid protest.  *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (quoting

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "A party seeking to establish jurisdiction under § 1491(b)(1) must show that it meets § 1491(b)(1)'s standing requirements, which are 'more stringent' than the standing requirements imposed by Article III of the Constitution." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)). To satisfy these more stringent requirements, a plaintiff must show that it is an "interested party," *see Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)), and "that it was prejudiced by a significant error in the procurement process," *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (citing *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002)).

An interested party is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." *Weeks Marine*, 575 F.3d at 1359 (quoting *American Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). To have a direct economic interest, the plaintiff must show that it had a substantial chance of winning the contract. *See Digitalis*, 664 F.3d at 1384. An interested party suffers prejudice from a significant procurement error when "but for the error, it would have had a substantial chance of securing the contract." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (emphasis omitted) (quoting *Labatt*, 577 F.3d at 1378); *see also Red Cedar Harmonia, LLC v. United States*, 144 Fed. Cl. 11, 21 (2019), *aff'd*, 840 Fed. Appx. 529 (2020). The prejudice inquiry and the economic-interest inquiry must not be conflated—"an error [may be] non-prejudicial to an economically interested offeror." *CliniComp*, 904 F.3d at 1358 (quoting *Labatt*, 577 F.3d at 1379-80); *see also Veteran Shredding, LLC v. United States*, 140 Fed. Cl. 759, 765 (2018) ("Despite the potential relevance of prejudice in determining substantial chance, direct economic interest should still be evaluated separately from prejudice."). "[A] party cannot be prejudiced unless it first has a substantial chance of [obtaining the] award." *Veteran Shredding*, 140 Fed. Cl. at 765.

## ANALYSIS

Quanterion's bid protest is governed primarily by the Code of Federal Regulations applicable to SBA's 8(a) program. "A procuring activity contracting officer indicates his or her formal intent to award a procurement requirement as an 8(a) contract by submitting a written offering letter to SBA." 13 C.F.R. § 124.502(a). "Upon receipt of the procuring activity's offer of a procurement requirement, SBA will determine whether it will accept the requirement for the 8(a) [business development ('BD')] program." 13 C.F.R. § 124.503(a). "Where SBA decides to accept an offering of a sole source 8(a) procurement, SBA will accept the offer both on behalf of the 8(a) BD program and in support of a specific Participant. As part of its acceptance of a sole source requirement, SBA will determine the eligibility of the Participant identified in the offering letter, using the same analysis set forth in § 124.501(g)." 13 C.F.R. § 124.503(a)(1). "Before a

Participant may be awarded . . . a sole source . . . 8(a) contract, SBA must determine that the Participant is eligible for award." 13 C.F.R. § 124.501(g).

Quanterion's protest centers on the determination to admit Kāpili into the 8(a) program, *i.e.*, to consider the requirement and the proposed 8(a) participant eligible for the 8(a) program. Plaintiff's arguments fall into two categories: challenges to SBA's decision to treat the proposed requirement as comprising new work and challenges to SBA's decision regarding Kāpili's eligibility, specifically its size.

### A. Adverse Impact Exception for New Work

"SBA will not accept a procurement for award as an 8(a) contract if," among other circumstances, "SBA has made a written determination that acceptance of the procurement for 8(a) award would have an adverse impact on an individual small business." 13 C.F.R. § 124.504(c). "[A]dverse impact does not apply to 'new' requirements. A new requirement is one which has not been previously procured by the relevant procuring activity." 13 C.F.R. § 124.504(c)(1)(ii). Notably, "[t]he expansion or modification of an existing requirement may be considered a new requirement where the magnitude of change is significant enough to cause a price adjustment of at least 25 percent (adjusted for inflation) or to require significant additional or different types of capabilities or work." 13 C.F.R. § 124.504(c)(1)(ii)(C).

The court addresses the parties' threshold dispute concerning new work under § 124.504(c)(1)(ii)(C). Citing a recent GAO decision, Quanterion asserts that the regulation must be read in the conjunctive, *i.e*, that magnitude of change of at least 25% must come from significant additional or types of capabilities or work. Pl.'s Mot. at 37 (citing *Eminent IT, LLC*, B-418570, 2020 CPD ¶ 222, 2020 WL 4260503 (Comp. Gen. June 23, 2020)). The government and Kāpili counter that the correct reading of the regulation is in the disjunctive, *i.e.*, that *either* a price adjustment of 25% *or* additional or different types of capabilities or work may *independently* constitute new work. Def.'s Cross-Mot. at 10; Def.-Int.'s Cross-Mot. at 4; *see also* Hr'g Tr. 28:24 to 29:9 (Nov. 3, 2021); Hr'g Tr. 40:17 to 25.[5] In its recently promulgated definition of a "follow-on requirement or contract," SBA acknowledged that the expansion or modification concept is disjunctive, 13 C.F.R. § 124.3 ("As a general guide, if the procurement satisfies at least one of these . . . conditions, it may be considered a new requirement."); however, SBA has expressed its preference against a strict, disjunctive approach focused on the 25% element of the rule in favor of a conjunctive approach that deemphasizes the 25% element of the rule, *see* 13 C.F.R. § 124.3 ("However, meeting any one of these conditions is not dispositive that a requirement is new. In particular, the 25 percent rule cannot be applied rigidly in all cases."); *see also* Consolidation of Mentor-Protege Programs and Other Government Contracting Amendments, 85 Fed. Reg. 66188 (Oct. 16, 2020) ("Amend § 124.504 by . . .

---

[5] The date will be omitted from further citations to the transcript of the hearing held on November 3, 2021.

[r]emoving the word 'will' and adding in its place 'may' in paragraph (c)(1)(ii)(C)."); *AccelGov, LLC v. United States*, __ Fed. Cl. __, No. 21-1647C, 2021 WL 4808039, at *7-8 (Sep. 30, 2021) ("In 2020, the SBA amended the regulation to ensure a twenty-five percent price variance would not be dispositive." (citing 85 Fed. Reg. 66188)). It is apparent, moreover, from the administrative record that SBA informed DTRA that § 124.504(c)(1)(ii)(C) was to be read in the conjunctive. *See* AR 24-505 (emails between SBA and DTRA stating the requirement in the conjunctive). The court will therefore decline the parties' invitation to read § 124.504(c)(1)(ii)(C) as strictly disjunctive or conjunctive. To do so is unnecessary both because of SBA's regulations and—as defendants aver, *see* Def.'s Cross-Mot. at 10-11, 28; Def.-Int.'s Mot. at 10-12—because the new requirement would pass muster under either the disjunctive or conjunctive reading of the regulation.

Turning to the parties' arguments, Quanterion contends that SBA's decision to readmit the requirement and Kāpili into the 8(a) program was procedurally irrational because SBA's acceptance letter lacks any explanation as to how or why it concluded that the Kāpili contract comprises new work, *see* Pl.'s Mot. at 29-31, and because it provides summary conclusions instead of reasoned explanation, *see id.* at 31. Namely, SBA's second acceptance decision, according to plaintiff, lacks any discussion, analysis, or explicit adoption of DTRA's document submissions, as well as applicable regulations. *Id.* at 31-32. The government counters that SBA's decision to admit the new requirement and Kāpili into the 8(a) program was not arbitrary and capricious for failure to explain its reasoning because SBA necessarily relied upon the agency's "considered analysis of its own requirement." Def.'s Cross-Mot. at 9, 28-29. Alternatively, defendant avers that the administrative record provides sufficient support for DTRA's decision even if the court considers SBA's second acceptance decision insufficiently detailed or explained. *Id.* at 9, 29-30. Kāpili, as defendant-intervenor, adds that Quanterion's argument boils down to a disagreement with "DTRA's technical judgment and the SBA's acceptance of the requirements into the 8(a) program," which decisions are entitled to deference because of DTRA's expertise in the existing and new contract requirements. Def.-Int.'s Cross-Mot. at 5-6.

The court concurs with the government and Kāpili that SBA's second acceptance letter reasonably implies that SBA reviewed, relied on, and agreed with DTRA's documentary submissions. *Compare* AR 58-5143 ("The *offer letter* indicates that this is a new 8(a) requirement.") (emphasis added), *with id.* (explaining that no adverse impact analysis was conducted "based upon the procurement history revealed in the *offer letter*") (emphasis added).[6]

---

[6] Quanterion acknowledges SBA's reliance on DTRA's documentary submissions in its motion for judgment. *See* Pl.'s Mot. at 41 ("The SBA failed in its responsibility to obtain a complete record through ordinary due diligence, and *instead* blindly *accepted DTRA's* unsubstantiated *claims and presentations* created in response to [Quanterion's] challenge to the acceptance of the Proposed Requirement into the 8(a) BD Program." (emphasis added)). Notably, the regulatory framework for offering a potential 8(a) contract requirement and

8

While the clarity of SBA's second offer letter may be "less than ideal," the court has no difficulty discerning "the agency's path" from DTRA's submissions to SBA's acceptance decision. *Fox*, 556 U.S. at 513-14. From this inference, the court looks to the administrative record to determine whether DTRA's documents provide "a coherent and reasonable explanation" of its conclusion that the contemplated Kāpili contract consisted of new or substantially different work under 13 C.F.R. § 124.504(c)(1)(ii)(C). *Hyperion*, 115 Fed. Cl. at 550.[7]

DTRA's submissions first establish the value of the Quanterion contract at $25.37 million, adjusted for inflation at $30.60 million, and converted from an 81-month period of performance to a 60-month (five-year) period of performance to match the new contract requirement at $22.66 million. AR 60g-5416. The agency's documents explain how these figures were calculated. AR 60g-5418 (listing executed task orders under the Quanterion contract, total cost, periods of performance, and sources of funding); AR 60g-5409 (adjusting the initial contract value "based on an estimated inflation factor of 21% for total inflation from 2015 (middle of the 2014 IDIQ [p]eriod of [p]erformance [(the Quanterion contract)]) to 2023 (middle of the FY21-26 [period of performance (the Kāpili contract)])"); AR 60g-5409 n.14 (explaining calculation of inflation rate). The DTRA submissions then establish the value of the

---

participant to SBA places the burden on the procuring agency, which implies that SBA is permitted to rely on the submissions that the regulation requires the agency to produce. *See* 13 C.F.R. § 124.502 (outlining the agency's responsibilities regarding its offering letter to SBA); *see also MCB Lighting & Elec.*, B-406703, 2012 CPD ¶ 206, 2012 WL 2878575, at *3 (Comp. Gen. Jul. 13, 2012) ("As a general matter, the SBA is entitled to rely on a contracting agency's representations in making decisions regarding 8(a) acquisitions, and SBA's regulations place primary responsibility on the procuring agency to submit all relevant information necessary to SBA's decision-making process.").

[7] In its motion for judgment and at a hearing before the court on November 3, 2021, Quanterion urged a narrow review of the administrative record limited to a line-by-line comparison of its performance work statement and the performance work statement for the anticipated Kāpili contract. Pl.'s Mot. at 36-37; Hr'g Tr. 14:2 to 9. Plaintiff contends that this limited record review proves that the Quanterion and Kāpili contract requirements are "nearly identical." Pl.'s Mot. at 37. The court rejects plaintiff's notion that administrative review should not include the entire administrative record. *See* 5 U.S.C. § 706 ("[T]he court shall review the whole record."). At bottom, Quanterion's request that the court limit its review to the performance work statements is an invitation to substitute its own judgment for that of the procuring officials at DTRA, something the court is not permitted to do. *See Hyperion*, 115 Fed. Cl. at 550. While the court is obliged to compare performance work statements as part of its review of the administrative record, *see, e.g., AccelGov*, ___ Fed. Cl. at ___; 2021 WL 4808039, at *8-9, it will not consider that segment of the record to be uniquely pertinent, especially where there is no regulatory requirement for the agency to submit such statements with its offer letter to SBA, *see* 13 C.F.R. § 124.502 (listing required contents of offer letter, without mentioning performance work statements).

contemplated contract to Kāpili at [***] million, while also explaining the sources used in forming the basis for this calculation and adjustments for inflation. AR 60g-5420 (listing labor categories and total cost based on a cross-referenced internal government cost estimate ("IGCE") prepared for the proposed acquisition); AR 60g-5411 ("The IGCE assumed a constant 3% year-over-year inflation rate for FY21 through FY26. As such the 5-year (60-month) totals shown in *Table 3* are effectively in FY23 dollars (the middle of the 5-year [period of performance]). The loading factors and fee rates used in the IGCE were based on the vendor proposals for [Task Orders] 0001 and HDTRA1-19-F-0079. The labor mix, subcontractor costs, and other direct costs (ODCs) were based on the Performance Work Statement (PWS), Quality Assurance Surveillance Plan (QASP), and Contract Delivery Requirements Lists (CDRLs) prepared for the acquisition.") (footnotes omitted). Under a disjunctive reading of § 124.504(c)(1)(ii)(C), the proposed contract requirement would constitute new work because the price adjustment would amount to [***] of the cost of the existing requirement, well exceeding the 25% requirement. *See* AR 60g-5417 ("When compared to the 2014 IDIQ 5-year [period of performance] baseline ($22.66M), this 'price adjustment' (+[***] over the baseline) increases to +[***].").

The documents also provide a rational basis for the determination that the new contract requirement consisted of a price adjustment greater than 25% due to new or different types of work under the conjunctive reading of § 124.504(c)(1)(ii)(C). After demonstrating the value of the existing and new requirements, DTRA's submissions describe the nature of the performance areas under the Kāpili contract as "Core Operations," "The Nuclear Information Analysis Center," and "The Advanced Search and Discovery Program." AR 60g-5410. The documents explain that,

> [Core Operation] tasks and scope are similar for both the 2014 IDIQ [(the Quanterion contract)] and FY21-26 Requirements [(the Kāpili contract)]. [Nuclear Information Analysis Center] tasks contain a mixture of tasks similar to the existing requirement but also require[] some tasks and skills that are substantially different from those required for the 2014 IDIQ. Effort under both of these Program Areas is to be increased under the FY21-26 Requirement. The [Advanced Search and Discovery] R&D Program Area is fully new for FY21-26, requiring new capabilities and work.

AR 60g-5410. The submitted materials then analyze, line by line, the types of work required under the existing and new requirements, demonstrate where tasks are the same, mixed, or entirely new, and indicate the percentage cost of new work under the projected Kāpili contract compared to the Quanterion contract. AR 60g-5421 to 5428. The documents conclude that "[t]he estimated cost of the [Advanced Search and Discovery] tasks represent a 'price adjustment' of +[***] relative to the inflation-adjusted, total cost ($30.60M) of the 2014 IDIQ [(the Quanterion contract)]. When compared to the 2014 IDIQ 5-year [period of performance] baseline ($22.66M), this . . . 'price adjustment' increase to +[***]." AR 60g-5417.

10

The court reviews the administrative record to ascertain whether SBA had a rational basis for accepting the requirement and Kāpili into the 8(a) program. *Centech*, 554 F.3d at 1037. The dispositive question is whether the record provides a coherent and reasonable explanation for the challenged decision. *Hyperion*, 115 Fed. Cl. at 550. The submissions described above provide the court with the requisite line of reasoning. DTRA envisioned a contract similar to Quanterion's but with two additional performance areas of mixed or entirely new work. The documentation is coherent and detailed. The court cannot adopt Quanterion's position that SBA acted arbitrarily or capriciously in deferring to DTRA's detailed and documented analysis of the existing and new requirements without substituting its own judgment for that of the agency.

Quanterion also raises a substantive disagreement with SBA's decision to admit the requirement and Kāpili into the 8(a) program. Namely, it urges that DTRA's submissions to SBA erred in determining that plaintiff had not performed certain work categories under the existing requirement, such as machine learning-related tasks, and that informal, internal agency communications referring to the new requirement as a "follow-on" contract disprove the agency's representations to SBA that the requirement included new types of work. Pl.'s Mot. at 33-41.[8] These other arguments against SBA's determination ask the court to substitute its judgment for that of the agency's procurement personnel who, unlike the court, have direct knowledge of the existing and new contracts and are therefore more qualified to make the assessment detailed above. *See Terex Corp. v. United States*, 104 Fed. Cl. 525, 532 (2012)

---

[8] Similarly, Quanterion raises a variety of cost-related arguments, reiterating its earlier contentions either that, procedurally, SBA irrationally relied upon DTRA's document submissions or that, substantively, the total cost increase of the new requirement did not exceed 25% of the existing requirement and include new work. Pl.'s Mot. at 42-47. For example, plaintiff invokes the internal government cost estimate included in DTRA's second offer letter to SBA to argue that SBA failed to take "[a] close look" at the agency's cost estimate, *id.* at 44, engaged in a "mistaken analysis" of the new requirement's cost estimate, *id.* at 46, did not "conduct proper diligence" in reviewing the cost estimate, *id.*, and "failed to properly engage with the available precedent" applicable to the cost estimate, *id.* at 47. On these bases, Quanterion avers that SBA should have rejected the agency's cost estimate, applied hypothetical surge pricing to Quanterion's contract to match the surge pricing estimated on the new requirement, and conducted its own cost analysis of the proposed Kāpili contract, to conclude that the new requirement was only minimally more expensive than the existing requirement. *Id.* at 43-46; *see also* Pl.'s Reply at 24 (arguing that the agency's submissions to SBA failed to "substantiate" DTRA's "estimate as reflective of the actual true cost of the contract, to describe which work is 'new' or 'meaningfully different' based on [the proposed performance work statement], or how the [estimated] 'surge options' are not just more of the same work performed by QSI."). As explained *supra*, SBA was entitled to rely on DTRA's assessment, so long as there was a coherent explanation in the record. *See Centech*, 554 F.3d at 1037. Even if the court treated Quanterion's cost arguments as independent protest grounds, procedural errors in estimating cost fail to demonstrate that the new requirement did not contemplate new types of work. Without that, plaintiff cannot show any prejudice in the agency's cost estimate or internal budgeting processes. *See, infra*, at 13-14.

("[W]here the resolution of an issue 'requires a high level of technical expertise,' it is 'properly left to the informed discretion of the responsible federal agencies.'" (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976))). In this instance, the court defers—as SBA did—to the procuring agency's technical expertise as to the nature of its research and development requirements under the Advanced Search and Discovery program area, as it is coherently and reasonably explained in the record. *See Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (requiring deference to an agency's decision if, among other things, it is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise" (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). Quanterion's arguments against the merits of SBA's and DTRA's conclusions only amount to a second plausible reading of the administrative record and would not satisfy plaintiff's "heavy burden of showing that the award decision had no rational basis." *Centech*, 554 F.3d at 1037.

The level of deference owed in the context of an 8(a) procurement is considerable. *Data Transformation Corp. v. United States*, 13 Cl. Ct. 165, 173 (1987) ("Judicial intrusion into the procurement process is generally infrequent, limited and circumspect. The discretion inherent in the section 8(a) contractor selection process requires even greater judicial restraint." (internal citations omitted)). In light of this level of deference, and the thoroughness and rationality of the agency's explanation, *Hyperion*, 115 Fed. Cl. at 550, the court upholds SBA's determination that the anticipated Kāpili contract consisted of new or substantially different types of work. SBA was therefore excused under 13 C.F.R. § 124.504(c)(1)(ii)(C) from conducting an adverse impact analysis on Quanterion prior to accepting the new requirement and Kāpili into the 8(a) program.

*B. Size Eligibility of Proposed 8(a) Participant*

SBA has a duty to verify a proposed 8(a) participant's size eligibility. "Eligibility is based on 8(a) BD program criteria, including whether the Participant," among other conditions, "[q]ualifies as a small business under the size standard corresponding to the [North American Industry Classification System ("NAICS")] code assigned to the requirement." 13 C.F.R. § 124.501(g)(1). SBA's duty to verify a proposed participant's size is reiterated in 13 C.F.R. § 124.503(c): "SBA will determine whether an appropriate match exists where the procuring activity identifies a particular Participant for a sole source award. . . . Once SBA determines that a procurement is suitable to be accepted as an 8(a) sole source contract, SBA will normally accept it on behalf of the Participant recommended by the procuring activity, provided that . . . [t]he Participant is small for the size standard corresponding to the NAICS code assigned to the requirement by the procuring activity contracting officer."

Quanterion makes two size-related arguments against SBA's decision to admit the new requirement and Kāpili into the 8(a) program. First, it asserts that SBA's decision was procedurally deficient because SBA did not conduct a second size determination on remand.

12

Pl.'s Mot. at 25-26. Second, it contends that SBA's decision was substantively deficient because Kāpili, by its own admission, is no longer a small business under the NAICS code that applies to the challenged procurement. Pl.'s Mot. at 27-28. The government counters that Quanterion lacks standing to challenge Kāpili's size eligibility because Quanterion is not an 8(a) participant and that controlling regulations do not require the SBA to conduct a second size determination. Def.'s Cross-Mot. at 39-43. Kāpili's arguments are materially identical. Def.-Int.'s Cross-Mot. at 21-30.

The parties dispute the timing of SBA's obligation to verify a proposed participant's size eligibility. Quanterion cites 13 C.F.R. § 124.501(g) ("SBA will determine eligibility at the time of its acceptance of the underlying requirement into the 8(a) BD program for a sole source 8(a) contract."). Pl.'s Mot. at 25-26. It argues that because SBA withdrew its acceptance of the requirement and Kāpili into the 8(a) program on remand, this regulation required a new size verification before reaccepting both into the program. *Id.* Had SBA done so, plaintiff contends, Kāpili would have been disqualified because, as it acknowledged, it no longer meets the size standard applicable to the new requirement. *Id.*

The government and Kāpili counter with 13 C.F.R. § 121.404(a) ("SBA determines the size status of a concern, including its affiliates, as of the date the concern submits a written self-certification that it is small to the procuring activity as part of its initial offer or response which includes price."), and 13 C.F.R. § 121.603(a) ("A[n] 8(a) BD Participant must certify that it qualifies as a small business under the NAICS code assigned to a particular 8(a) BD subcontract as part of its initial offer including price to the procuring agency. The Participant also must submit a copy of its offer, including its self-certification as to size, to the appropriate SBA district office at the same time it submits the offer to the procuring agency."). Def.'s Cross-Mot. at 41; Def.-Int.'s Cross-Mot. at 25. They argue that Kāpili's size certification, submitted with its offer in December 2020, was still valid after SBA's adoption on remand, obviating the need to reverify its size upon reacceptance. Def.'s Cross-Mot. at 41-42 Def.-Int.'s Cross-Mot. at 28-29; *see also* 13 C.F.R. § 121.603(c)(1) ("Where SBA verifies that the selected Participant is small for a particular procurement, subsequent changes in size up to the date of award . . . will not affect the firm's size status for that procurement.").

For purposes of Quanterion's bid protest, if defendants' contention prevailed, and the court applied 13 C.F.R. §§ 121.404(a) and 121.603(a) and (c), there would be no error, and, therefore, no prejudice to Quanterion. Alternatively, if Quanterion's argument prevailed, and the court applied 13 C.F.R. § 124.501(g) the way that plaintiff proposes, there would be a procedural error but no harm to Quanterion. Though Quanterion would have prevailed in challenging SBA's size verification, ostensibly removing Kāpili from consideration now that it has surpassed the applicable size standard, the proposed requirement would still consist of new work that would permit DTRA to resubmit it to the 8(a) program with any other eligible 8(a) participant. The court does not, by this reasoning, decide the merit of defendants' shared contention that

13

SBA could use the substitution mechanism of 13 C.F.R. § 124.503(e) to replace Kāpili with the other potential 8(a) contractor that DTRA had identified during market research.  Def.'s Cross-Mot. at 40-41; Def.-Int.'s Cross-Mot. at 24-25.  The court, instead, notes that because SBA made a rationally supported decision that the requirement involved new work, the requirement would still involve new work even if the court remanded the case for a subsequent procedural error, effectively precluding Quanterion from showing a substantial chance of obtaining an award.  *See Axiom*, 564 F.3d at 1381 (requiring that plaintiff "must show a clear and *prejudicial* violation" to prevail on a violation of regulation or procedure (emphasis added)); *Digitalis*, 664 F.3d at 1384 (requiring showing that plaintiff had a substantial chance of winning the contract); *Veteran Shredding*, 140 Fed. Cl. at 765 ("[A] party cannot be prejudiced unless it first has a substantial chance of [obtaining the] award.").

The court therefore rejects Quanterion's challenge of SBA's size verification process in its decision to reaffirm the requirement and admit Kāpili into the 8(a) program.

## CONCLUSION

For the foregoing reasons, Quanterion's motion for judgment on the administrative record is DENIED, and defendant's and defendant-intervenor's motions for judgment on the administrative record are GRANTED.

The Clerk shall enter judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge